432 P.2d 811

Margaret McCULLOUGH and Broadway
Lumber Company, Plain-
tiffs-Appellees,

v.

Edward H. SNOW and Frances M. Snow, his
wife, Donald F. Matheson and Mary E.
Matheson, his wife, and Elmer T. Lewis
and Dorothy R. Lewis, his wife, Defend-
ants-Appellants.

No. 8176.

Supreme Court of New Mexico.

Oct. 30, 1967.

Marron & Houk, Dan A. McKinnon III,
Albuquerque, for appellants.

William J. Sullivan, Lawson K. Stiff,
Albuquerque, for appellees.

*OPINION ON MOTION
FOR REHEARING*

PER CURIAM:

Upon consideration of motion for re-
hearing, the opinion heretofore filed is
withdrawn and the following substituted
therefor:

**456**

## OPINION

MOISE, Justice.

This appeal is from a judgment entered on two notes and an open account in two cases consolidated for trial in the lower court. One action was brought by appellee Margaret McCullough, and the other by appellee Broadway Lumber Company. The transactions forming the basis for the litigation were between Broadway Lumber Company and appellant-defendants. Hereinafter, the appellees will be referred to collectively as "Broadway," and the appellants will be referred to as "Snow."

The dealings between the parties covered a considerable period of time and involved, not only Broadway and Snow, but one Jack Stagner and a number of companies owned by him, hereinafter collectively referred to as "Stagner." The record discloses and the court found that Stagner was purchasing building materials from Broadway, a part of which were in turn incorporated in homes being built for Snow. On February 27, 1960, Stagner was indebted to Broadway in an amount in excess of $450,000.00, and on that date Broadway had a right to file mechanics' lien claim in the amount of $150,327.60 against the Snow houses. By letter from Snow to Broadway, dated February 27, 1960, in consideration of Broadway's agreement not to file liens against Snow's property, Snow agreed to indemnify Broadway against loss on account of the indebtedness in the amount of $150,327.60, and agreed to a payment schedule of the same; in addition, Snow agreed to make purchases of all building materials from Broadway until Broadway had realized a profit thereon equal to an amount owing by Stagner of approximately $100,000.00 for which Snow was not otherwise responsible. At the time of the agreement, Stagner's financial statements reflected a considerable net worth.

Some time after February 27, 1960, by arrangement with Stagner, Snow undertook the liquidation of Stagner's assets, applying the proceeds therefrom to the payment of Stagner's debts, but paying no part thereof to Broadway. Neither did Snow make the payments agreed to be made in the February 27, 1960 agreement. Accordingly, on October 6, 1960, a new agreement was made by Broadway, Snow and Stagner wherein, except for certain items therein specifically reserved, the parties released each other and Snow agreed to pay Broadway $51,532.-65, $130,715.10, and $101,192.02, represented by notes, and which amounts were arrived at through negotiation, and represented the balances owing under the February 27, 1960 agreement and additional amounts owed by Stagner and assumed by Snow. Broadway, in return, among other things, assigned its claim against Stagner in the amount of $317,705.93, and agreed to join with Snow in guaranteeing performance of a real estate contract on certain property in Grants, New Mexico, which had belonged to Stagner and which had been sold to one George T. Koran. The trial court found, concerning the agreement, as follows:

"17. That on October 6, 1960, Snow and Broadway entered into a written agreement whereby the obligations that Snow assumed under the February 27, 1960 agreement were reduced to promissory notes and extension of the time of payment given, and Snow agreed to assume additional obligations that Stagner owed Broadway and Broadway agreed to forbear collection of the obligations evidenced by the February 27, 1960 agreement and to forbear suit against Stagner which had been assumed by Snow, and further, Broadway agreed to change the trustee of Stagner's assets."

Upon Snow's defaulting in the payments on the three notes executed on or about October 6, 1960, still another agreement was made under date of October 23, 1961, by the terms of which Snow executed and delivered to Broadway three notes for $25,-000.00, $200,000.00, and $100,000.00, respectively due 60 days from date, 30 days from date and 18 months from date, all with interest at 6%. In consideration of the execution of the three notes by Snow, Broadway assigned to Snow without recourse the

two notes previously executed of $130,715.10 and $101,191.02; acknowledged payment in full of the $51,532.65 note; transferred to Snow all of Broadway's interest in obligations endorsed over to Snow; conveyed to Snow all of Broadway's interest in a certain real estate contract; released Snow from any claims which Broadway might have on account of any and all transactions between them.

Finally, on February 16, 1962, Snow again having defaulted on the obligations undertaken on October 23, 1961, another agreement was entered into between the parties.

The trial court made the following finding in connection therewith:

"That on February 16, 1962, Snow and Broadway entered into a written agreement whereby the obligations of Snow under the October 23, 1961 agreement were extended, and Snow agreed to assume additional obligations that Stagner owed Broadway and to pay other obligations incurred by him, and did execute and deliver to the First National Bank in Albuquerque [held in its name on behalf of Broadway, and since transferred to it] a promissory note in the amount of $327,500.00, a promissory note to Broadway Lumber Company, a corporation, in the amount of $25,000.00, and did pay $7,520.89 as interest on the promissory notes executed by Snow under the October 23, 1961 agreement. That Broadway, in consideration therefor, did forego the right of suit against Snow for the notes delivered under the October 23, 1961 agreement."

The trial court also found that Snow paid $175,000.00 on the note of $327,500.00 but nothing more, and that a balance of $194,728.16 principal, together with $46,572.26 interest and $24,130.00 attorney fees were due and owing. In addition, the court found the $25,000.00 note past due and unpaid, and that Broadway was entitled to judgment for the principal amount plus $9,071.58 interest and $3,407.00 attorney fees.

Judgment was entered pursuant to the above findings and for $7,215.64 additional, representing an open account found to be owing, together with interest.

This appeal raises only the question of whether the notes sued upon were supported by valid consideration, independent of agreements to forbear to sue on notes being renewed, and whether they were violative of our statutes against usury. No complaint is made of the judgment on the open account. Neither is any issue made concerning the computations by which the various amounts found to be due and owing were arrived at, except as those amounts include assumption by Snow of ever increasing amounts of Stagner's debts, and assertedly without additional consideration to Snow. Admittedly, each of the renewal notes included assumption of additional amounts owing by Stagner, and were for amounts greater than would result from adding the maximum of legally permitted interest, provided in § 50–6–16, N.M.S.A. 1953. In these circumstances, Snow argues that the additional amounts assumed by him over and above the original amount plus interest, were exacted as a premium for granting forbearance and were accordingly usurious.

Our usury statute is § 50–6–15, N.M.S.A. 1953, which reads as follows:

"No person, corporation or association, directly or indirectly, shall take, reserve, receive or charge any interest, discount or other advantage for the loan of money or credit or the forbearance or postponement of the right to receive money or credit except at the rates permitted in this act [50–6–15 to 50–6–19]."

It is Snow's position that the applicable rule of law is that set forth in Restatement, Contracts, § 528, which reads:

"A bargain accompanying and collateral to a bargain for a loan of money or for extending the maturity of a pecuniary debt, if providing for only a fair equivalent to the creditor for the consideration that he gives, is not taken into account in computing the creditor's prof-

458

it, in order to determine whether the bargain for a loan or an extension is usurious, unless his intention is to secure a greater profit for the loan or extension than is allowed by law."

and that the situation here comes directly within the same, as is illustrated by Comment (a) and Illustration (5) thereunder. They read:

"a. The facts that a collateral bargain involves some profit to the lender and that the loan or extension would not have been made without the collateral bargain are not alone enough to make the transaction usurious. The advantage that the creditor derives from the collateral bargain must be greater than would be normally derived therefrom if it were an independent transaction, or his intent must otherwise appear to derive an excessive profit from the loan or extension.

"Illustrations:

" * * *

"5. A lends B $5000 for a year at the highest permissible rate of interest and as part of the bargain B guarantees payment of an antecedent debt of B's son to A. The transaction is usurious, since A derives an advantage from the collateral bargain for which he gives no equivalent."

This court has never been called upon to rule on the question here presented. In Anderson v. Beadle, 35 N.M. 654, 5 P.2d 528 (1931), we held that the usury statute then in effect was violated when a profit greater than the maximum lawful rate of interest was charged for a loan or for forbearance, and that the form it took was immaterial. Here, however, the question is: Was there such a charge or did Broadway give good consideration for Snow's assumption of Stagner's debts? The trial court concluded that it did and that there had been no violation of the usury statute. We agree.

▇▇ First, we would note that although Snow argues the burden of proving the absence of usury was on Broadway, citing 91 C.J.S. Usury § 114, p. 698; Adjustment Service Bureau, Inc. v. Buelow, 196 Minn. 563, 265 N.W. 659 (1936); and Chakalas v. Djiovanides, 161 Va. 48, 170 S.E. 848 (1933), we are not convinced that this accords with the rules therein set forth. We are impressed that when the notes sued upon show no indication of usury on their face, the burden of proving usury like any other defense in a civil action is on the party asserting it. Southwestern Lumber Co. of New Jersey v. Kerr, 11 F.Supp. 253 (D.C.S.D.Tex.1934); Murphy Finance Co. v. Fredericks, 177 Neb. 1, 127 N.W.2d 924 (1964); Maestro Music, Inc. v. Rudolph Wurlitzer Co., 88 Ariz. 222, 354 P.2d 266 (1960); Olson v. Caufield, 32 Idaho 308, 182 P. 527 (1919). Concerning the quantum of proof required to establish the defense of usury, it should suffice to note that there is a wide variation between the states. See Annot., 51 A.L.R.2d 1087 (1957). In the instant case, the court found an absence of usury. Accordingly, it is unnecessary to determine the amount of proof required to establish its presence. It is sufficient for our purpose that nothing has been called to our attention which would require that we overturn the finding made by the court. In other words, even if usury were considered established if supported by only substantial evidence, being the standard applied by us in the ordinary case, it is not in accord with our practice that we disturb findings of the court unless reasonable minds cannot differ concerning a contrary result. Varney v. Taylor, 77 N.M. 28, 419 P.2d 234 (1966). Compare Giovannini v. Turrietta, 76 N.M. 344, 414 P.2d 855 (1966). We see no basis or reason for overruling the findings of the trial court.

As already noted, Snow places principal reliance on the rule announced in § 528, Restatement, Contracts, quoted above. He also calls our attention to decisions which apply a similar rule. Winder National Bank v. Graham, 38 Ga.App. 552, 144 S.E. 357 (1928); Ferdon v. Zarriello Bros. Inc., 87 N.J.Super. 124, 208 A.2d 186 (1965),

wherein may be found a very thorough and complete discussion of the rule; and Canal-Commercial Trust and Savings Bank v. Brewer, 143 Miss. 146, 108 So. 424, 47 A.L.R. 45 (1926), are of this character.

■ We have no disagreement with Restatement, Contracts, § 528, or with any of these cases. We would observe, however, as did the author of the annotation appearing at 47 A.L.R. 57, that " * * * there is a decided conflict of authority on the question whether a lender may exact some collateral advantage, additional to the legal rate of interest, without making the loan usurious." The conflict between the cases, if it properly may be so described, can be explained, in our opinion, on the differing fact situations being considered. Where the evidence discloses that a borrower is required to guarantee a loan to a third person in order to get a loan himself or get his loan renewed or extended, this is usurious unless, because of the facts surrounding the transaction, there is some intimate business connection as distinguished from kinship, between the loan being renewed and extended and the indebtedness being assumed, and a present consideration as well as an absence of intention to exact a usurious return. Of this type are several fairly old cases of which Valentine v. Conner, 40 N.Y. 248, 100 Am.Dec. 476 (1869); Roane v. Bank of Nashville, 1 Head (Tenn.) 526 (1858); Crawford v. Benoist, 97 Mo.App. 219, 70 S.W. 1098 (1902), are examples.

Although Snow suggests that since the turn of the century, all decisions have been otherwise, we are not convinced that there has been any basic change in the law. See 13 Minn.L.Rev. 165 (1928); 30 Colum. L.Rev. 747 (1930); 47 A.L.R. 57.

A most interesting and instructive case, wherein a part of indebtedness assumed was held usurious and another part was not, is Simpson v. Charters, 188 Ga. 842, 5 S.E. 2d 27 (1939). Also compare, Armstrong v. City National Bank of Galveston, 16 S.W. 2d 954 (1929), cert. den., 281 U.S. 737, 50 S.Ct. 333, 74 L.Ed. 1152 (Tex.Civ.App. 1930).

Probably the closest case on its facts, however, is the recent case of Harrison v. Arrendale, 113 Ga.App. 118, 147 S.E.2d 356 (1966). Plaintiffs were the makers of notes which they claimed to be usurious because there had been included in renewals certain amounts loaned to a third party by the name of Ralph Richards. We quote from that case:

"It might be argued, and with cogent reason, that it should make no difference whether plaintiffs' assumption of Richards' debts was voluntary or involuntary so long as defendant received a collateral advantage which plaintiffs were under no obligation to give him. We think that in the absence of consideration moving to plaintiffs in return for their assumption of Richards' debts this argument would have merit. But here, the jury could have found that such consideration, other than the loans to plaintiffs themselves, actually existed. Whenever plaintiffs executed a new note, it was customary between the parties that defendant return the checks evidencing Richards' indebtedness. Presumably, it was thereby intended to release Richards, and if so, this constituted additional consideration to plaintiffs. Where an excess is paid, or contracted to be paid, for other good and valuable considerations beyond the mere use of money not interposed as a device to cover usury, the excess is not usury. Atlanta Mining & C. Co. v. Gwyer, 48 Ga. 9, 11(2); Simpson v. Charters, 188 Ga. 842, 849, 5 S.E.2d 27, supra; Sledd v. Pilot Life Ins. Co., 52 Ga.App. 326, 327, 183 S.E. 199."

■ In the instant case, where the close business relationship between Snow and Stagner was present, and where Snow had an obligation and reason for assuming the original indebtedness which could have resulted in a lien · on Snow's property, and still another reason to assume additional amounts thereafter when he took and disposed of all of Stagner's assets which Broadway had a right to try to reach to satisfy Stagner's indebtedness, we cannot

say that as a matter of law the transaction was usurious. Beyond this, there is not one word of proof that Broadway forced or exacted anything from Snow, or intended to collect amounts prohibited by the usury statute. See Community Credit Union v. Connors, 141 Conn. 301, 105 A.2d 772 (1954), as well as Restatement, Contracts, § 528, concerning the requirement that a specific intent be present. So far as the record discloses, each transaction leading up to the final execution of the notes sued on was entered into by mutual arm's length negotiations and with advice of counsel, and included consideration sufficient under the law as hereinabove announced and over and beyond the mere assumption by Snow of additional obligations of Stagner. As already noted, we cannot state that the conclusion by the court that the loan was not usurious lacks support in the evidence so as to require reversal.

The judgment is affirmed.

It is so ordered.

CHAVEZ, C. J., and HENSLEY, Jr., C. J., Court of Appeals, concur.